GAZENA C. JONES, APPELLANT, *v.* ORVIS H. ZOLLER
AND OTHERS, RESPONDENTS.

*Marriage — by a wife in good faith after a five years' absence of her husband — 3 R. S. (7th ed.), 2332, sec. 6 — it is not essential to the validity of the marriage that the husband should leave the general locality where he formerly resided.*

In an action to recover dower it appeared that the plaintiff while living at Goveneur had, in 1875, married one Jones, and thereafter removed with him to Pamelia, where she lived with him as his wife until his death in 1880. Prior to her marriage to Jones, and in 1855, the plaintiff had married one Firth and lived with him at various places until 1858, when they went to Syracuse and there resided until 1860, when the plaintiff separated from him and went to live with her relatives in Jefferson county. With the exception of seventeen months during which he served in the army, and portions of 1863 and 1864 when he worked at Pitthole, Pennsylvania, Firth continued to reside in Syracuse until about June, 1864, when he went to Otisco, a town distant about thirteen miles from Syracuse, where he has ever since resided. He saw and corresponded with the plaintiff at intervals down to March, 1864. In June, 1864, the plaintiff received a letter from a person whom she knew to be a friend of her husband stating that the latter had died suddenly of cholera on Lake Erie, that his body had been thrown overboard and that the writer was with him at the time of his death. The letter was shown to the brothers and sisters of Firth, and to the plaintiff's relatives, by whom investigations were made but nothing was learned of the writer or of Firth. The plaintiff heard that Firth was alive in 1876, and she saw him in 1879.

Upon the trial the court held that section 6 of the Revised Statutes (7th ed.), 2332, providing that "if any person whose husband or wife shall have absented himself or herself for the space of five successive years, without being known to such person to be living during that time, shall marry during the lifetime of such absent husband or wife, the marriage shall be void only from the time

that its nullity shall be pronounced by a court of competent authority," applied only to cases in which the person absented himself from the general locality in which he lived; and that as Firth continued to live in the same general locality during the time of his absence from his wife there was no question to be submitted to the jury.

*Held,* error.

APPEAL from a judgment dismissing the complaint, entered upon a verdict directed for the defendants at the Jefferson Circuit.

The action was brought by the plaintiff to recover dower in several parcels of land described in the complaint. The plaintiff alleged that she had intermarried with and become the wife of James Jones, now deceased, and continued his lawful wife until the time of his death, which occurred on the 28th of October, 1880, and that he was seized in fee simple of the said lands. The plaintiff was married to Jones in October, 1875, in the city of Watertown. She was married at Deer River, Lewis county, to John J. Firth in October, 1855. Firth was alive and was present at the trial now under review, which was had at Watertown in April, 1882. The plaintiff asked at the close of the evidence to have submitted to the jury the question as to the absence of Firth, and the court refused and the plaintiff excepted. The court directed a verdict for the defendants and the plaintiff excepted.

*Elon R. Brown,* for the appellant.

*O'Brien & Emerson,* for the respondent Zoller.

*Porter & Walts,* for the respondents Fleming and Van Ness.

HARDIN, J.:

John D. Firth was intermarried with the plaintiff in October, 1855, and they lived and cohabited as husband and wife at Deer River, Pamelia Four Corners and in Troy until 1858, when they removed to Syracuse and there resided until 1860, when the plaintiff separated from him and went to reside with her relatives in Jefferson. In December, 1861, Firth entered into the United States army and served some seventeen months and then returned to Syracuse and resided there and in surrounding towns, except in 1863 and 1864 when he was at work at Pitthole, Pennsylvania. From that place he returned to Syracuse, and plaintiff visited him at Syracuse and

talked of returning to live with him, and he gave her fifty dollars to aid her in a millinery business she was conducting in Goveneur. Firth engaged a house to live in, but shortly after received a letter from her that stated she had concluded not to return to live with him. In March, 1864, he called upon her in Goveneur. In June, 1864, plaintiff received a letter from one George W. Shepard, whom she knew in Troy to be her husband's friend, which purported to have been written on shipboard on Lake Erie. It stated that Firth had died suddenly of Asiatic cholera and that his body had been thrown overboard, and that the writer of the letter was with him at the time of his decease. This letter was shown to the brothers and sisters of Firth and the relatives of the plaintiff, by whom an investigation was made, but nothing was learned of the writer or of Firth. About the time the letter was written Firth went to Pitthole, Pennsylvania, and remained some eighteen months. He then returned to Syracuse where he remained a short time, after which he went to the town of Otisco, Onondaga, some thirteen miles from Syracuse, where he has since resided. Plaintiff heard nothing of Firth from 1864 until after her marriage to Jones, of Pamelia, in October, 1875. She went to reside with Jones as his wife, and continued so to reside with him until about 1st of February, 1880. Jones died in 1880 seized of the 2,000 acres of land described in the complaint. In June, 1876, plaintiff learned that Firth was alive, and she saw him in 1879. Upon the trial the court refused to submit any questions to the jury and ordered a verdict for the defendants, and a judgment has been entered upon that verdict dismissing the plaintiff's complaint. Was the ruling at the circuit correct?

Section 6 of the Revised Statutes (vol. 3, 7th ed.), 2332, reads, viz.:

"SECTION 6. If any person whose *husband or wife shall have absented* himself or herself for the space of five successive years, without being *known to such person* to be living during that time, shall marry during the *lifetime of such absent* husband or wife, the marriage shall be void *only from the time* that its nullity shall be *pronounced by a court of competent authority*."

Two leading facts must be found to bring a case within the terms of this statute: First. "That the husband has absented himself;" and, secondly. "That he has not been known to the wife to

be living during the 'space' of five successive years." The learned circuit judge assumed that the latter requirement of the statute was manifestly known, and assumed correctly, as we think, that the plaintiff did not know that Firth was living when she intermarried with Jones, and more than the "space of five successive years" had elapsed without her having any knowledge that Firth was living.

But he held that the other provision of the statute could not be satisfied by the evidence then before the court, and that in that regard there was no question for the jury; and he stated the result reached by him was because he held the statute to mean, when it says "absented himself," that the husband has "absented himself from the *general locality* in which he lived" and he added, "as Firth has lived in the same general locality and has not been absent from the same general locality in five successive years," that the case could not be submitted to the jury. This construction is too narrow. The words "absented himself" evidently refer to a withdrawal of his whereabouts from his wife, his relatives, from the ordinary and usual opportunities of identification. That withdrawal from his wife and family which would, after the lapse of five successive years, lead naturally to the inference that death had ensued. The evidence tended to support the averment that Firth had "absented himself," and would have warranted a verdict to that effect. (*McCartee* v. *Camel*, 1 Barb. Ch., 456; *Sheldon* v. *Ferris*, 45 Barb., 124.) The learned circuit judge, therefore, erred when he refused to submit to the jury the question as to whether Firth had "absented himself," so that the plaintiff was protected in her second marriage by the statute quoted. By the common law the second marriage of the plaintiff would have been void. However, by an early statute of this state such a marriage, after an absence of five years of the husband, the party marrying would have been exempt from the penal charge of bigamy. (*Williamson* v. *Parisien*, 1 Johns Ch., 389.) The fifth section of the Revised Statutes (3 R. S. [7th ed.], p. 2332) in terms declares "that no second or subsequent marriage shall be contracted by any person during the lifetime of any former husband or wife of such person, unless: First. The marriage with such former husband or wife shall have been annulled or dissolved for some other cause other than the adultery of such person; or Second. * * * Every marriage contracted in violation of *the provision of this sec-*

*tion* shall, except in the *case provided for in the next section, be absolutely void.*" The latter part of this section in its words of exception saves from the terms of its inhibition such second marriages as fall within the permissive terms of section 6, which we have already quoted.

It would seem, therefore, quite clear that such second marriages as come within the terms of the sixth section are not prohibited, nor are they declared void. But they may be declared void by a court of competent authority; "and they are void only from the time that the nullity shall be pronounced" by such a court.

Such seems to be the construction which was sanctioned by the court in *Griffin* v. *Banks* (24 How., 215), and CLERKE, J., said such a marriage "has the same force and effect as if when it was solemnized, McCullom (the first husband) was not alive." And he then assumed to dispose of the case upon the assumption that such a second marriage was as "legal in its origin and continuance as any other marriage." Following that authority we may not say that the erroneous ruling we have pointed out worked no injury to the plaintiff. (See, also, *Cropsey* v. *McKinney*, 30 Barb., 47; *Brower* v. *Bowers*, 1 Abb. Dec., 223; *Blott* v. *Rider*, 48 How., 94; 1 Scrib. on Dower, 100; *Spicer* v. *Spicer*, 16 Abb. [N. S.], 124; *Valleau* v. *Valleau*, 6 Paige, 209.)

It was provided in section 36 of the Revised Statutes (see vol. 3 [5th ed.], 233) that an application to annul such a second marriage as the one claimed by plaintiff might be brought in "the lifetime of the other" by either of the parties to the second marriage, "or upon the application of such former husband or wife." Then follows section 37, which provides that "when it shall appear and be so decreed that such subsequent marriage was contracted in good faith, * * * the issue of such marriage, born or begotten before its nullity shall be declared, shall be entitled to succeed in the same manner as legitimate children to the real and personal estate of the parent who at the time of the marriage was competent to contract; and the issue so entitled shall be specified in the sentence of nulity."

We see nothing in that section which aids the position of the defendants, nor in the ninth section of the statute excepting certain persons from the operation of the statute as to bigamy, to lead us to

give (3 R. S. [7th ed.], 2510) a different construction from the one we have intimated already.

For the error we have pointed out in the course of the trial at the circuit, we are of the opinion there should be a reversal of the judgment entered upon the verdict directed.

Smith, P. J., and Barker, J., concurred.

Judgment reversed and a new trial ordered, with costs to abide the event.